PULLMAN CO. v. HUNT.†

(Circuit Court of Appeals, Fifth Circuit. January 26, 1909.)

No. 1,827.

FALSE IMPRISONMENT (§ 39*)—CIVIL LIABILITY—TRIAL—WRONGFUL ARREST OF PASSENGER.

Evidence considered in an action by a passenger against a sleeping car company to recover damages for causing his wrongful arrest, and *held* sufficient to warrant the submission to the jury of the question whether the arrest, which was admittedly wrongful, was at the instance of the conductor of a car, in defendant's employ.

[Ed. Note.—For other cases, see False Imprisonment, Dec. Dig. § 39.*]

Pardee, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Southern District of Florida.

John E. Hartridge, for plaintiff in error.

Robt. W. Davis and Hilton S. Hampton, for defendant in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge. This action was brought by W. F. Hunt, the defendant in error, against the Pullman Company, a corporation, plaintiff in error, in the state circuit court for Hillsborough county, Fla. The material part of the declaration is, in substance, as follows:

That on the 26th day of February, A. D. 1906, plaintiff was a passenger on a passenger train on the Atlantic Coast Line Railroad proceeding from Port Tampa to Jacksonville, in the state of Florida, and was an occupant of a sleeping car commonly known as a "Pullman car," owned and operated by the defendant, the Pullman Company, and had paid his fare to the defendant for a seat and berth from the station known as "Port Tampa" to the city of Jacksonville in Florida in one of the defendant's cars. That the conductor in charge of the Pullman car pointed out to plaintiff the berth he should occupy, and then took from plaintiff the ticket sold to him by the ticket agent of the defendant, and for which plaintiff had paid the price and sum demanded of him. That .the plaintiff was allowed to occupy and sleep in the car and in the berth pointed out to him, and, after having occupied the same during the night, the conductor, on the morning of February 26, 1906, and before plaintiff had reached the city of Jacksonville, claimed that plaintiff was an imposter and had not paid his fare, and had pointed plaintiff out to a detective in the employ of the company, and caused the detective to approach plaintiff in the car and arrest him, or pretend to arrest him, in the presence of all those on the car, and that the detective did willfully and maliciously denounce him in a loud and boisterous manner, and call him a "smooth one." thereby meaning that plaintiff was a rascal and an imposter, and told plaintiff that he was under arrest for stealing a sleeping car ticket, and that he would take plaintiff back to Tampa as a prisoner.

That when the train had arrived in Jacksonville the detective still detained plaintiff, and continued to denounce him in the presence of others in the same manner that he had done upon the Pullman car, and caused him to miss the railroad connection that he had intended to make, and then, after many and divers indignities, vile epithets, and gross insinuations heaped upon plaintiff, discharged and released him and told him he might go. That all these things were done, and these epithets and insinuations were cast at and heaped upon plaintiff, in the presence of others, and to the great chagrin, mortification, and humiliation of plaintiff, and to his great inconvenience. That it was done by the agents and officers of the corporation in a highly offensive way, and without cause or excuse, and without any provocation upon the part of plaintiff. That it greatly humiliated him, and was a great shock to his nervous system, and an injury to his good name and reputation. That he has suffered and still suffers from the nervous shock then given him, and is now greatly humiliated and depressed because of said indignities. That his reputation and good name has been greatly injured. That he has thereby been caused great expense, and for all these things a right of action has accrued to the plaintiff to receive from the defendant the sum of $3,000; wherefore he brings this suit.

By proper proceedings the case was removed by the Pullman Company to the United States Circuit Court. The demurrer to the petition being overruled, defendant pleaded not guilty, on which plea issue was joined, and the case came on for trial before a jury. When the plaintiff had introduced his proof and rested, the defendant asked the court for an affirmative charge in favor of the defendant, to which the court replied, "I think there is a scintilla of evidence as to whether or not he was pointed out by the conductor to the alleged sheriff," and the request was refused. The defendant offered testimony, and rested; the plaintiff introduced other testimony. Thereupon the defendant's attorney, after the argument had closed, again requested the court to instruct the jury to find a verdict for the defendant, which request the court refused. There was a verdict for the plaintiff, assessing his damages at $1,500. On the motion for a new trial, based in part on the refusal to give the affirmative charge, the judge ordered that, upon the plaintiff filing a remitter of $750 from the verdict of $1,500, the motion for a new trial should be denied. Plaintiff filed the required remittitur, and judgment was entered on the verdict and the remittitur for $750. The defendant sued out this writ of error. The one error assigned is the refusal of the judge to instruct the verdict in favor of the defendant.

We recite the substance of the judge's summary of his view of the testimony bearing on that assignment of error:

"This cause has come on to be heard upon a motion for a new trial. The testimony tends to show that the plaintiff purchased a sleeper ticket from the agent of the defendant company, at Port Tampa, and received, or supposed he had received, a ticket for a certain berth in a sleeping car for Jacksonville, Fla.; that he presented the same to the sleeping car conductor, and was assigned a berth and occupied the same until the next morning. It also appeared that another party had purchased a sleeping car ticket from Port Tampa to Jersey City, N. J., but lost the same, or claimed that some one had stolen it

from him, and was compelled to purchase another berth in another car on the same train. In complaining of being compelled to buy another berth, the matter was brought to the attention of the conductors of the cars, and in comparing the tickets they had taken up they found the ticket claimed to have been lost by the passenger bound for Jersey City, calling for lower 8, to have been presented by the plaintiff as his ticket for lower 3, which berth he occupied. A deputy sheriff of Hillsborough county being a passenger on the same train, hearing the passenger complaining of the theft of his ticket, he considered it his duty to investigate the charge, it being claimed to have been committed within his county, and went into the car where the plaintiff was sitting, and inquired of the conductor which section the party was occupying that had presented the alleged stolen ticket, and the plaintiff was pointed out to him. Whereupon the deputy sheriff asked the plaintiff to step out in the vestibule of the car, which he did, where he stated to him that he had been accused of having in his possession the sleeping car ticket which belonged to another, and inquired his name, business, character, etc. After some conversation and a sufficient display of his identity, his business connections and standing, the deputy sheriff stated, 'that will do for the present,' at which the plaintiff returned to his section in the car, procured his hand baggage, and went his way. There is some conflict of testimony in regard to the facts which led the deputy sheriff to interest himself in the matters, as to whether he was a passenger in the Pullman car, and whether he had been brought in there by information conveyed to him by the conductor of the car, and also as to the action which was taken by the agents of the defendant, the conductors of the Pullman cars, in pointing out the plaintiff to the deputy sheriff. The conflict of testimony is such that I am not fully satisfied that there was no evidence which would justify the jury in finding that the deputy sheriff was instructed or directed to speak to and interview the plaintiff and to ask him to step out in the vestibule for the purpose of having a conversation."

It will be observed that the trial judge announced on the first request by defendant for an affirmative charge, that he thought that there was a scintilla of evidence as to whether the plaintff was pointed out to the sheriff by the conductor. And, in acting on the motion for a new trial, the trial judge announced that the conflict in the testimony is such that he was not fully satisfied that there was no evidence which would justify the jury in finding that the deputy sheriff was instructed or directed to speak to or interview the plaintiff, and to ask him to step out in the vestibule for the purpose of having a conversation.

The very able counsel for the plaintiff in error, in his printed brief, uses this language:

"It is respectfully submitted that there is not a scintilla, not a suspicion or particle, of testimony to show any illegal act, or unlawful act, or improper act upon the part of the defendant company, its agents, employés, or any one acting for it."

And he adds:

"In the early days judges were in the habit of allowing a case to go to the jury upon a mere scintilla of evidence; but as we have grown wiser and riper by experience, the courts have refused to sanction a recovery upon a mere scintilla of evidence."

A due respect for the able counsel and for the learned trial judge who sat in this case in the Circuit Court constrains us to make a somewhat ample summary of the testimony bearing upon this question as it addresses itself to our minds.

W. F. Hunt, the plaintiff below and defendant in error here, testified on his own behalf on the stand in open court:

"My home is in Nashville; I am in the poultry and egg business; have lived in Nashville ever since I was born."

A short time before the 25th of February, 1906, having occasion to visit Havana, Cuba, he procured a round-trip ticket from his home in Nashville, Tenn., to Havana on a route passing through Jacksonville and Port Tampa, Fla. The 25th of February was Sunday, and the Tuesday before that he had passed through Tampa en route to Havana, and then and there had, at the Pullman Company's office, engaged a berth on the sleeper from Port Tampa to Jacksonville, and had the agent to mark his name and reservation on the diagram for the day that he intended to arrive on his return trip at Port Tampa. When he arrived Sunday evening, February 25th, at Port Tampa, he went to the Pullman Company's agent at their office in Port Tampa, and asked him if he had a reservation for Mr. Hunt from Tampa to Jacksonville. The agent said, "No." He then told the agent that was a singular thing—that he had reserved a berth on the Tuesday previous at Tampa on this train. The agent then addressed a man in the office, whom the witness afterwards found to be the agent at Tampa proper, and asked him if he had a reservation for Mr. Hunt. He looked at the diagrams and said, "Yes, lower 3, Car D." The agent who had first been asked if he had a reservation for Mr. Hunt, after receiving the answer from the second agent, said, "Mark it sold," and then asked Mr. Hunt to let him see his railroad ticket. Mr. Hunt gave him his round-trip ticket and $2 to pay for the berth from Tampa to Jacksonville, and received back his ticket and a Pullman ticket, and put them in his pocket, and did not refer to them any more until he got into Tampa. There he got supper in town, and going back to the train asked the first conductor he came to which was car D? and the conductor said the second car back. The witness started to go along the train, and the conductor told him to go right through the first car into the second car, which was car D. He went in car D, put his suit case under the berth, came out and walked around, talking over business, with a friend, who was with him on the car as far as Yebor City, where this friend left the train. The witness then went back from the front of the train through the first sleeping car to the second sleeping car, and presented his railway ticket and Pullman ticket to the conductor, when the conductor told him "You don't belong to this car, but you belong to car L; this ticket calls for lower 8 in car L." The witness replied, "This is a mistake, for my reservation is for lower 3 in car D," but said to the conductor, "To satisfy you, I will go in car L and see if my berth in that car is taken." But the conductor said the witness did not belong to that car, and he added:

" 'I have checked the car entirely, and everything in there is accounted for; you must belong to the back car,' and I said: 'I know I did not belong to the back car.' I was going into the third car, and he said, 'Tell the conductor to look at ticket 325.' I was casually acquainted with that conductor, and said to him, 'Mr. Goldsmith, look at the diagram and see if Hunt is not on the diagram for lower 3 in car D.' He looked and answered 'Yes.' "

The witness then said, "Here's the ticket the agent at Port Tampa gave me for this berth." The conductor immediately took the railroad ticket and the Pullman ticket and gave the witness back a stub, which the witness put in his pocketbook and went to bed. The next morning while sitting in the washroom, used for a smoking room, two Pullman conductors came in the smoking room where the witness was sitting, and the Pullman conductor in the car which witness occupied pointed the witness out to the other conductor as the man who had the ticket—

"and he began to interrogate me and asked where I got the ticket, and I said I got it from the agent at Fort Tampa. He said, 'What did you give for it?' and I said, '$2.' He asked me first to show my ticket, and I showed it to him. He said, 'You got a bargain, a ticket to Jersey City for $2.' I said I was not going to Jersey City, but was going to Jacksonville. My railroad ticket carried me to Nashville. And he made the remark, 'You are out just $2.'"

Mr. Goldsmith was in the room with this other conductor at the time, and smiled when the other conductor told the witness he was just out $2. After some explanation, not necessary to recite, the witness went back to berth 3, where he had slept, when a gentleman walked in that car and came up to witness and said, "Good morning," in a pleasant way. Witness did not know him, but supposed he was some one he had met on the boat coming from Havana. This stranger, having passed by a little, immediately returned and touched the witness on the shoulder, and said, "I want to see you in the vestibule," and the witness walked out, went into the vestibule near the washroom where he had had the talk with the two conductors, and the stranger raised himself up and said, "I understand you are the illegal possessor on this train of a Pullman ticket from Tampa to Jersey City?" and added, "I am the sheriff of Hillsborough county, and will have to take you back to Tampa." The witness replied, "If you are the sheriff of Hillsborough county, I will go back to Tampa, but I could explain the matter to you," which he proceeded to do, when the other replied, "Oh, you never practiced in Florida. You can tell your trouble to the court. I will take you back to Tampa." The witness said, "Before I leave this train, I want to see who ordered me arrested," and immediately went into the car ahead of where he slept, and found the man who, the second conductor had said, had lost the ticket, and asked him if he had ordered the arrest, and was told, "No," and replied, "Here is a man representing himself to be the sheriff of Hillsborough county, Fla.," and was answered, "I don't know anything about it." Witness then asked the name of this gentleman, who told him his name was John Farr, of New York City. Witness then said, "I want to know if you ordered my arrest," and Mr. Farr said he did not, that he was only too glad to get his berth back, that he slept in a berth and was satisfied. Witness then went back to the car where he slept, car D, followed on the heels by the sheriff of Hillsborough county, whose name he learned afterwards was Depew, and when they got back to berth 3, Depew spoke to witness in a loud voice and said, "I have been down here 25 years, and no smooth ones have gotten by Tampa yet." Witness then said, "I

want to give you my identification to show you who I am. Hunt is my name; I live at Nashville, Tenn." And witness showed him an annual pass he had on one of the roads out of Nashville as proof that he was Hunt, and also showed him a check for goods sold to one Walter Wills in Tampa, and also a postal card he had of the Postal Telegraph Company which allowed him to sign for telegrams, and as a last resort pulled out a receipt he had for his Masonic lodge dues which he had paid only a few days before. Witness testifies that the deputy sheriff kept talking the matter over, and kept up his harangue until after they got to Jacksonville, when he told witness that he had him identified, and would drop the matter temporarily on his own responsibility; that he could get witness whenever he wanted him. By which time they were standing in the depot at Jacksonville, and plaintiff had missed his train out of Jacksonville, having meant to catch the Georgia Southern & Florida Railway, which, he says, he could have done if he had not been interrupted and detained by the arrest. On cross-examination by the Pullman Company's attorney, the witness testified that when the Pullman conductors came in the dressing room where witness was sitting, and the conductor of his car pointed him out to the other conductor, the sheriff was not with them. He came in something like half an hour later, when witness was sitting in his car in his seat, and then had the interview recited; that when he went to car D, where the reservation was assigned to him, he asked Mr. Goldsmith, the conductor of that car, to look on the diagram which he had in his hand, and see if Hunt's name was on the diagram, and he said, "Yes."

Witness John E. Lellyett testified:

"I live at Nashville, Tenn.; I have lived there all my life; I am a lawyer by profession; I know William F. Hunt, plaintiff in this case; have known him 10 or 12 years; he is a wholesale dealer in poultry; ships poultry; his character in the community in which he lives is very good; he is a man of honesty, integrity, and good social worth."

W. W. Draper, conductor of the Pullman car L, called for the Pullman Company, was asked, on cross-examination:

"Wasn't Mr. Depew a passenger in your car that night? A. I don't think so. Q. Was the man that lost the ticket a passenger in your car? A. Yes, sir. Q. Mr. Hunt was not a passenger in your car? A. No, sir."

S. M. Goldsmith, Pullman conductor, called by the company, was asked, on cross-examination:

"You did not know that Mr. Depew came into the car the next morning? A. I remember Mr. Depew on the car, but don't remember when he was in the car."

J. B. Allen, called as a witness in behalf of the plaintiff, testified that he was the train conductor on the Atlantic Coast Line Railway train from Port Tampa to Jacksonville the night Mr. Hunt got into trouble about the ticket; he saw Mr. Depew, the city detective, on the train; the witness knew Mr. Depew; had had some conversation with him after being told about the trouble in the Pullman car. In reference to that trouble he said:

"I took up the tickets in the day coach; between the hours of 8 p. m. and 8 a. m. the Pullman men take up the transportation, and after I had worked

the train I went back into the Pullman car to check up with the conductor and get the railway transportation. and while getting up one, I don't remember which, he told me about a mistake, or a man had the wrong ticket, and further up, riding with Depew, I told him about it. I told him that some man had a wrong ticket—a Pullman ticket—and the next morning Depew was sitting up in the coach with me while I was ready. and one of the Pullman men came up—I don't remember which one. I could not tell which one. I have to report the amount of passengers handled in the car, and usually they come up after we leave Green Cove Springs, and I introduced him to Mr. Depew, and what happened afterwards I don't know, because I didn't go back, I don't think."

Being asked, "When you introduced him (the Pullman conductor) to Mr. Depew, state whether or not Depew and the conductor afterwards went back into the Pullman car," he answered, "They both went back after that; whether they went together I don't know." Being asked, "Whether or not, soon after the men went back, you heard Depew made the arrest?" answered, "No, sir; not until I got to Jacksonville and got off." Being asked to state whether or not he understood the Pullman conductor was talking to him about a man in his car, said "Yes, but I don't know which one Hunt was in, and I don't know which conductor told him about it." Being asked, "Was Mr. Depew in the Pullman car that night?" answered, "I don't think he was; I think he was in the day couch." Being asked, "You knew when you introduced this man (the Pullman conductor), that Mr. Depew was connected with the police force?" he answered, "Yes, sir."

Walter Wills, being called as a witness on behalf of plaintiff, testified: "I know Mr. Hunt." Being asked, "Do you now recall being with him on or about the 25th of February, 1906, when he made a reservation in a Pullman car, and, if you do, state to the jury what you know about it?" counsel for the defendant interrupted and said, "There is no dispute he had the reservation."

The two Pullman car conductors and Mr. Depew, the deputy sheriff, were called on behalf of the Pullman Company, and each testified that the Pullman conductors had not brought the matter to the attention of the deputy sheriff, or in any way instigated the arrest. The deputy sheriff himself testified that the Pullman conductors had not brought the matter to his attention, and that he took the matter up on his own responsibility on having heard complaint made by the passenger who had lost his ticket. They were examined at some length, but it is not necessary to recite their testimony further than to show this conflict with the other testimony which we have recited. The matter was submitted to the jury under instructions by the trial judge, which we must assume were proper, as they are not criticised by the plaintiff in error. If the facts admitted, and those which the testimony, if believed, at least tends to prove, are not amply sufficient to support the verdict, they are such that reasonable minds might well infer from them the conclusion which the jury did draw, and it, therefore, was the right of defendant in error to have the issue submitted to the jury.

The judgment is affirmed.

PARDEE, Circuit Judge, dissents.